# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| UNITED STATES OF AMERICA, )<br><br>v. )<br><br>GREGORY LOMBARDI, )<br>    Defendant. )<br> | C.A. No. 1:23-cr-00102-MSM-AEM |

## MEMORANDUM AND ORDER

Mary S. McElroy, United States District Judge.

Before the Court is the defendant Gregory Lombardi's Motion to Suppress Evidence and Statements (ECF No. 20). Mr. Lombardi seeks suppression of physical evidence and statements made by him to police and federal agents during their execution of a search warrant to seize evidence of crimes involving the possession and distribution of child pornography. *Id.* at 1. He argues that this evidence was obtained in violation of his rights under the Fourth, Fifth, and Sixth Amendments. *Id.; see* ECF No. 49. In response, the United States contends that all physical evidence was either obtained under the warrant itself or an exception to the warrant requirement, and that Mr. Lombardi's statements were made following a valid waiver of his Fifth and Sixth Amendment rights. (ECF Nos. 22, 46.) For the following reasons, the Court DENIES Mr. Lombardi's Motion.

# I.    BACKGROUND

This case stems from an international investigation into an anonymous individual suspected of plotting to abuse children.    (ECF No. 47-2 at 12.) Investigators tracked internet accounts associated with this individual to an account on Telegram, an encrypted messaging application.  *Id.* at 13–14.   Undercover officers contacted that account through Telegram and attempted to lure its user to an in-person meeting, using as bait the opportunity to abuse a (fictitious) child.  *Id.* at 15–16; 64–67.   During this exchange, the Telegram account sent child pornography to the undercover officers.  *Id.* at 16.

Through the IP address associated with the Telegram account, police were able to track the user to a Rhode Island address.  *Id.* at 14.   Police subsequently identified three individuals associated with that address: Mr. Lombardi's father-in-law, his husband, and his brother-in-law.  *Id.* at 17, 23.   Police did not identify Mr. Lombardi as associated with the address during this initial investigation.  *Id.* at 113–18.   Based on their findings, police began preparing an affidavit for a warrant to search the address for electronic devices containing evidence related to the possession or distribution of child pornography.  *Id.* at 16–20.

After the Telegram user backed out of an arranged meet-up, police proceeded by obtaining the search warrant.   *Id.* at 67–68; *see* ECF No. 30.   This warrant authorized police to search the "entire property" at the address, as well as the persons of the three individuals identified by police as associated with the address if those individuals were present at the address at the time of the search warrant's execution.

(ECF No. 30 at 3.)  The warrant permitted police to seize and to search the contents of, among other things, "cellular telephones" at the subject premises.  *Id.* at 38–44. The search warrant did not expressly authorize a search of Mr. Lombardi's person, given that his association with the address was unknown to police at the time the warrant issued.  *See id.* at 3; *see also* ECF No. 47-2 at 114–17.

Police then executed the search warrant.  (ECF No. 47-2 at 20.)  Inside the residence, police encountered five individuals, including two individuals named in the warrant and Mr. Lombardi.  *Id.* at 23.  Mr. Lombardi was found in a bedroom in the residence, apparently manipulating something with his left hand, outside the officer's line of sight due to Mr. Lombardi's "bladed" position with respect to the officer.  *Id.* at 160–62.  Police ordered Mr. Lombardi to raise his hands and escorted him to a dining room table, where an officer began to frisk him for weapons.  *Id.* at 162–64.

At an evidentiary hearing on the present Motion, the frisking officer testified about what followed:

Q.    And what happened next?

A.    While performing a check of the waistband area I could hear an audible noise coming from Mr. Lombardi's left-hand side.

Q.    What did you do?

A.    I asked him what was in his pocket.

Q.    Did Mr. Lombardi respond?

A.    He did.

Q.    What did he say?

A.    He advised that it was a phone.

3

Q.    And what did you say next?

A.    I instructed him to remove the phone from his pocket.

Q.    And what happened?

A.    He complied.  He took the phone out of his pocket and handed it to me.

Q.    Now, why did you tell him to show you what was in his pocket?

A.    That was the same side that was bladed away from me; but I could hear that there was a noise, so in order to confirm what he was saying I asked him to remove it from his, whatever the object was from his pocket.

Q.    And what did Mr. Lombardi do with the phone?

A.    He handed it to me.

*Id.* at 163–64.

The officer took Mr. Lombardi's phone, which was unlocked, and placed it on a hutch on the wall in the dining room.  *Id.* at 28; 164–65.  Another officer then conducted a "preview" of the phone and discovered the messages between the Telegram account and the undercover officers, indicating to police that they had located the device they were looking for.  *Id.* at 28–29.  Around that time, during a call with the Assistant United States Attorney ("AUSA") assigned to the case, the AUSA instructed one of the officers to cease any further search of the phone's contents.  *Id.* at 98–101.  The officers did not, however, return the phone to Mr. Lombardi.  *Id.* at 101.

Officers then interviewed Mr. Lombardi.  *Id.* at 29; *see* ECF No. 20-2.  At the outset of that recorded interview, the officers told Mr. Lombardi that he was not free

4

to leave.  (ECF No. 20-2 at 3.)  The following exchange then occurred as the officer handed Mr. Lombardi a *Miranda* waiver form:

| | |
|---|---|
| Officer: | So as far as that, we'd like to talk to you.  As part of that, we need to make you aware of your rights, so I'm just going to give you this form right here, if you can take a look at it. |
| Mr. Lombardi: | Yes.  Okay. |
| Officer: | Okay. |
| Mr. Lombardi: | Um, do you want me to initial the sides? |
| Officer: | Yeah, we—yeah, and then right up here. |
| Mr. Lombardi: | Okay. |

*Id.* at 3–4.  After a brief exchange regarding the date and proper location for signatures and Mr. Lombardi's execution of those signatures, discussion of the waiver concluded as follows:

| | |
|---|---|
| Officer: | All right.  And you write and understand? |
| Mr. Lombardi: | Yes. |

*Id.* at 4.  Regarding Mr. Lombardi's swift signature of the *Miranda* wavier, the officer conducting the interview later explained that "[a]s soon as [I] handed it to him, he looked at it and asked where to sign."  (ECF No. 47-2 at 32.)

The interview itself lasted about seven minutes.  *Id.* at 35.  During the interview, the officers asked Mr. Lombardi whether he lived at the address, which he denied.  (ECF No. 20-2 at 5.)  Officers then asked Mr. Lombardi for the passcode to his phone, and, after some back and forth about whether the warrant authorized police to search Mr. Lombardi's device given his assertions that he was not a resident

at the address, he declined, claiming that he had "forgot" and that he instead used the phone's facial recognition to unlock it. *Id.* at 6–9. After Mr. Lombardi initially denied having recently used Telegram, when officers told him that they knew that to be untruthful and pressed him on his use of that application, Mr. Lombardi invoked his right to silence, and the officers terminated the interview. *Id.* at 10–12.

During the officers' execution of the search warrant, one of them apparently recognized Mr. Lombardi as having been investigated and arrested for prior child pornography offenses, one of which led to a state criminal conviction. (ECF No. 47-2 at 186–87.) The officers subsequently obtained documentation from a state court website indicating that Mr. Lombardi remained on probation for that prior criminal conviction. *Id.* at 192–95. The documentation included a copy of a Fourth Amendment waiver form executed by Mr. Lombardi in connection with his plea agreement for that conviction. *Id.* at 192. This waiver authorized warrantless searches of Mr. Lombardi's digital devices—at least in connection to enforcing the terms of his probation—and required him to provide PIN codes for those devices when needed. *Id.* at 192, 239–40.

Officers then asked Mr. Lombardi for his phone's PIN code a second time. *Id.* at 193. This second interaction was not recorded because the officers reportedly believed that Mr. Lombardi was required, under the terms of his probation conditions, to provide the PIN code upon their request. *Id.* at 194. Mr. Lombardi informed the officers that he was no longer on probation and therefore not required to turn over the PIN code, but the officers did not believe him, apparently based on

discrepancies in what he said during the prior interview and because they had no reason at the time to think that the documents they obtained from the court were outdated. *Id.* at 194–96. After being warned that failure to provide the PIN code could violate his probation, Mr. Lombardi ultimately disclosed the code to the officers. *Id.* at 211. The PIN code was apparently the same code that Mr. Lombardi had provided during one of the previous investigations and was based on his date of birth. *Id.* at 197–98.[1]

Law enforcement subsequently finished executing the search warrant, transported Mr. Lombardi to the United States Marshals Office, and began a full forensic extraction of the phone's contents. *Id.* at 46. Later that same day, the assigned AUSA contacted the officers and instructed them to again stop their forensic analysis of the phone because the AUSA had just learned that Mr. Lombardi's probation had, in fact, been terminated before the date of the search warrant's execution. *Id.* at 46–47; 151–53. Mr. Lombardi's probation's early termination resulted from his completion of a new "good time" credit system for probation. *See* ECF No. 47-3 at 49–50. The court had not yet updated its online information at the time officers accessed it to determine Mr. Lombardi's probation status. *Id.* at 47. Law enforcement did not have direct access at that time to the electronic systems that would have reflected the change in Mr. Lombardi's status. *Id.* While the officers

---

[1] While police evidently did not require the PIN code to access his cell phone, as it was unlocked at the time they seized it, they wanted it to facilitate a full forensic analysis of the phone. *Id.* at 223.

could have directly contacted the probation office to verify Mr. Lombardi's status, this was apparently not common practice. *Id.* at 64–66.

The officers then applied for and received a second search warrant specifically authorizing the search of Mr. Lombardi's cell phone. *See* ECF No. 30-1. The affidavit in support of this warrant mentioned that law enforcement had conducted a "preview" of the phone's contents but did not disclose what those contents were. *Id.* at 3. The affidavit otherwise generally described the events of the first warrant's execution, including the back-and-forth between officers and the United States Attorney's Office regarding their authority to search the contents of the phone. *Id.* at 2–4. Investigators subsequently conducted a full forensic analysis of the phone's contents. (ECF No. 47-3 at 7.)

## II.    GOVERNING LAW

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. "The text of the Amendment thus expressly imposes two requirements. First, all searches and seizures must be reasonable. Second, a warrant may not be issued unless probable cause is properly established and the scope of the authorized search is set out with particularity." *Kentucky v. King*, 563 U.S. 452, 459 (2011).

"A search within the meaning of the Fourth Amendment occurs whenever the government intrudes upon any place and in relation to any item in which a person has a reasonable expectation of privacy." *United States v. Sheehan*, 70 F.4th 36, 44 (1st Cir. 2022). "[T]he relevant inquiry in deciding whether a seizure [of a person] occurred," on the other hand, "is whether 'in view of all the circumstances surrounding the incident, a reasonable person would have believed that he [or she] was not free to leave." *United States v. Howard*, 66 F.4th 33, 42 (1st Cir. 2023), (quoting *United States v. Mendenhall*, 446 U.S. 544, 553 (1980)). "A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984).

Searches and seizures within a residence are presumptively unreasonable absent a search warrant. *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006); *see also United States v. Forbes*, 181 F.3d 1, 5 (1st. Cir. 1999) ("A warrantless search violates the Fourth Amendment unless it comes within one of the 'few specifically established and well-delineated exceptions" to the warrant requirement."") (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)). "Whether a search exceeds the scope of a search warrant is an issue [courts] determine through an objective assessment of the circumstances surrounding the issuance of the warrant, the contents of the search warrant, and the circumstances of the search." *United States v. Pimentel*, 26 F.4th 86, 92 (1st Cir. 2022). However, "because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain

exceptions." *Brigham City*, 547 U.S. at 403 (citing *Flippo v. W. Virginia*, 528 U.S. 11, 13 (1999)).  The Government bears the burden of proving the applicability of an exception by the preponderance of the evidence.  *United States v. Matlock*, 415 U.S. 164, 177 (1974).

Evidence obtained in violation of an individual's Fourth Amendment rights is subject to a judicially established "exclusionary rule that, when applicable, forbids the use of improperly obtained evidence at trial." *Herring v. United States*, 555 U.S. 135, 139 (2009).  "[T]he exclusionary rule also prohibits the introduction of derivative evidence, both tangible and testimonial, that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search, up to the point at which the connection with the unlawful search becomes 'so attenuated as to dissipate the taint.'" *Murray v. United States*, 487 U.S. 533, 536–37 (1988) (quoting *Nardone v. United States*, 308 U.S. 338, 341 (1939)).  This prophylactic rule "was adopted to effectuate the Fourth Amendment right of all citizens 'to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" *United States v. Clanadra,* 414 U.S. 338 (1974) (quoting U.S. Const. amend. IV). Similarly to the warrant requirement, however, the exclusionary rule is subject to certain exceptions that permit evidence that was obtained in violation of an individual's Fourth Amendment rights to still be used against that individual at trial.  *See Arizona v. Evans*, 514 U.S. 1, 10 (1995) ("We have recognized, however, that the Fourth Amendment contains no provision expressly precluding the use of evidence obtained in violation of its commands.").

The exclusionary rule also applies to statements obtained in violation of an individual's rights under the Fifth Amendment, which provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . nor be deprived of life, liberty, or property, without due process of law." U.S. Const.. amend. V; *see Dickerson v. United States*, 530 U.S. 428, 433 (2000).  To comport with the Fifth Amendment, statements obtained by police must be both voluntary and made following a knowing and voluntary waiver of the right to self-incrimination.  *See Miranda v. United States,* 384 U.S. 436, 444 (1966); *Dickerson*, 530 U.S. at 433 ("Over

time, our cases recognized two constitutional bases for the requirement that a confession be voluntary to be admitted into evidence: the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment."); *see also United States v. Jackson*, 918 F.2d 236, 241 (1st Cir. 1990) ("An involuntary statement violates due process and its admission into evidence mandates vacation of the conviction even though other evidence in the case would have been sufficient to convict.").

"The voluntariness of an admission depends on 'whether the will of the defendant [was] overborne so that the statement was not his free and voluntary act, and that question [is] to be resolved in light of the totality of the circumstances.'" *United States v. Jackson*, 918 F.2d 236, 241 (1st Cir. 1990) (alterations in original) (quoting *Bryant v. Vose*, 785 F.2d 364, 367–68 (1st Cir. 1986)). The government bears the burden of proving voluntariness by a preponderance of the evidence. *Id.* "Relevant considerations include the length and nature of the questioning, promises or threats made by investigators, and any deprivation of the suspect's essential needs." *United States v. Jacques*, 744 F.3d 804, 809 (1st Cir. 2014). "They also include the defendant's personal circumstances, including his age, education, intelligence, and mental condition, as well as his prior experience with the criminal justice system." *Id.* (internal citation omitted).

As for the validity of *Miranda* waivers, as with establishing voluntariness, the burden is on the prosecution to "to establish waiver by a preponderance of the evidence." *Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010). "'The waiver inquiry

"has two distinct dimensions': waiver must be 'voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception,' and 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" *Id.* at 382–83 (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).  An oral recitation of the *Miranda* rights is not necessarily required. *See United States v. Van Dusen*, 431 F.2d 1278, 1280 (1st Cir. 1970) ("Appellant asserts that, faced with a refusal to sign the waiver, the agents should have given the warning orally.  We cannot say that as a matter of law such a course of action is required.").

## III.   DISCUSSION

Mr. Lombardi's Motion to Suppress seeks suppression of evidence based on alleged violations of his Fourth, Fifth, and Sixth Amendment rights.  (ECF No. 20 at 1.)He first asserts that he was subjected to an unlawful, warrantless seizure and subsequent search of both his person and his cell phone's contents, in violation of his Fourth Amendment right against unreasonable searches and seizures. *Id.*  He also alleges that his Fifth and Sixth Amendment rights "were violated over the course of two separate interrogations." *Id.*

The Court addresses each of these claims in turn.

### A.   The Fourth Amendment Does Not Require Suppression of Evidence from Mr. Lombardi's Phone.

#### 1.   Mr. Lombardi's Detention was Reasonable

Mr. Lombardi first challenges his detention both during and after the search warrant's execution.  (ECF No. 20-1 at 7.)   While Mr. Lombardi recognizes that,

under *Michigan v. Summers*, "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted," 452 U.S. 692, 705 (1981), he argues that his detention was nevertheless unreasonable. (ECF No. 20-1 at 7–8.)

To the extent that the officers initially detained Mr. Lombardi during the search warrant's execution, that detention was clearly reasonable. *See Muehler v. Mena*, 544 U.S. 93, 98 (2005) (explaining that "[a]n officer's authority to detain incident to a search is categorical"). To the extent that Mr. Lombardi was further detained by the officers, the reasonableness of that detention necessarily depends on whether they developed probable cause to believe that he was the target of their investigation. The officers quickly found evidence on Mr. Lombardi's cell phone indicating that he was the Telegram user they were looking for. Even if that evidence were not clearly admissible to prove guilt at trial, it was enough to support probable cause that officers needed to arrest Mr. Lombardi. *See Brinegar v. United States*, 338 U.S. 160, 172–73 (1949) (distinguishing "the difference between that is required to prove guilt in a criminal case and what is required to show probable cause for arrest or search").[2] As a result, the officers' detention of Mr. Lombardi both during the initial execution of the search warrant and after they previewed his cell phone's conduct was reasonable.

---

[2] This is not to say that an arrest justified by inadmissible evidence can, in turn, be used to justify the admissibility of that evidence. *See New York v. Harris*, 495 U.S. 14, 19 (1990) (describing "the familiar proposition that the indirect fruits of an illegal search or arrest should be suppressed when they bear a sufficiently close relationship to the underlying illegality").

### 2. The Seizure of Mr. Lombardi's Phone Was Within the Scope of the Warrant

Mr. Lombardi next argues that the search of his person and the seizure of his cell phone exceeded the scope of the search warrant. (ECF No. 20-1 at 8.) He acknowledges that the search warrant authorized officers to search both the target address itself and the persons of the individuals named in the warrant to seize any handheld digital devices or cell phones. (ECF No. 47-1 at 35.)But Mr. Lombardi contends that the search warrant did not authorize the search of any other person. *Id.* Therefore, because Mr. Lombardi's cell phone was on his person when the officers demanded that he hand it over, that demand exceeded the scope of the warrant. *Id.*

For comparison, Mr. Lombardi turns to *United States v. Sheehan*, 70 F.4th 36 (1st Cir. 2023). (ECF No. 47-1 at 35.) There, police obtained a warrant allowing them to search both the defendant's residence and his person for electronic devices, including cell phones. *Sheehan*, 70 F.4th at 41. The defendant's wife had his cell phone in her possession at the time police executed the warrant. *Id.* As the wife attempted to make a call with the phone, one of the officers seized it from her hands. *Id.* The defendant sought suppression of evidence obtained from the phone arguing that police's seizure of the phone exceeded the scope of the warrant. *Id.* at 42.

The First Circuit disagreed. *Id.* at 44. It noted that the defendant "point[ed] to no evidence that the phone was concealed on his wife's person" at the time police seized it. *Id.* Nor did the defendant "point to any evidence that the police patted [the wife] down or rummaged through her pockets to obtain it." *Id.* The First Circuit consequently determined that, within the Fourth Amendment context, no search had

taken place, explaining that there is no intrusion against a person's "reasonable expectation of privacy . . . when an object is simply held in one's hand and the officer on the scene can see that the held object is subject to seizure pursuant to the terms of a warrant." *Id.* As such, because the warrant authorized police to seize any cell phones they found in the defendant's home, and because the defendant's cell phone was in the defendant's home at the time police executed the warrant, their seizure of the phone from the wife's hands was authorized by the warrant even though it did not name her as a person to be searched. *Id.*

Mr. Lombardi seeks to distinguish this case from *Sheehan* by pointing to the fact that, at the time the officer demanded Mr. Lombardi hand over his cell phone, it was in his pocket. (ECF No. 47-1 at 34–35.) To evaluate this claim, the Court must first distinguish between the alleged search of Mr. Lombardi's person and the seizure of the cell phone. The officer undoubtedly seized Mr. Lombardi's cell phone when he took it from his person. *See Jacobsen*, 466 U.S. at 113. However, *Sheehan* suggests that this seizure fell within the scope of the first search warrant because that warrant authorized the seizure of all "cellular telephones . . . that may be, or are used" to engage in specified activities related to the possession or distribution of child pornography. *See* ECF No. 30 at 41. Under *Sheehan*, the fact that the cell phone was taken from the person of an individual not named in the warrant did not mean that the officer lacked the authority to seize it when given the opportunity to do so. 70 F.4th at 41.

The remaining question, then, is whether the officer conducted a search outside the scope of the warrant when he took the cell phone from Mr. Lombardi. First, the Court finds that the officer's question to Mr. Lombardi as to what the source of the noise coming from his pocket was did not itself constitute a Fourth Amendment search. *See United States v. St.*, 614 F.3d 228, 233–34 (6th Cir. 2010) (explaining that, while "words alone may amount to a search," no search occurred when an officer asked whether a defendant "had anything in his pocket" because "those sorts of questions are not the verbal equivalent of reaching into a suspect's pocket to remove the contents"); *United States v. Griffin*, 696 F.3d 1354, 1362–63 (11th Cir. 2012) ("Whatever else they might be, questions posed by a police officer to a suspect about what he has in his pocket . . . are not, in the Fourth Amendment sense, a search.").

Instead, whether the officer conducted a Fourth Amendment search depends on whether, once Mr. Lombardi identified the source of the noise in his pocket as a cell phone, the officer's order to Mr. Lombardi to hand over the phone constituted a search. Generally, the fact that police have a warrant to search premises does not automatically authorize them to search people found within those premises but not named in the warrant. *See Ybarra v. Illinois*, 444 U.S. 85, 91 (1979) ("Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person. This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be."); *but see Maryland v. Pringle*, 540 U.S. 366, 373 (2003)

(permitting search of car passengers because "it was reasonable for the officer to infer a common enterprise among the three men"). Further, it seems likely that, generally, a demand that a suspect "empty his pockets" constitutes a search within the meaning of the Fourth Amendment because that demand is essentially "the verbal equivalent of reaching into a suspect's pocket to remove the contents." *Street*, 614 F.3d at 234 (collecting cases and concluding that "an officer may not sidestep the requirements of the Fourth Amendment by directing a suspect to 'empty your pockets,' then disclaim any constitutional violation on the ground that he verbally directed the suspect to act without touching or in any way searching him").

Here, however, the officer's demand was not that Mr. Lombardi "empty his pockets"; instead, it was that Mr. Lombardi hand over his cell phone, a cell phone which the officer was authorized by the warrant to seize and which Mr. Lombardi admitted was in his pocket after its noise alerted the officer. In comparison, the Court first turns to *United States v. Pope*, 686 F.3d 1078 (9th Cir. 2012). There, after an officer smelled marijuana on the defendant during a traffic stop and the defendant admitted to possessing marijuana in his pocket, the officer ordered the defendant to place the marijuana on the hood of his car. *Id.* at 1080. The court first explained that "a Fourth Amendment search occurs when police command a person to reveal something in which he would otherwise have a reasonable expectation of privacy *and* that thing or that area is revealed as a result of the command." *Id.* at 1082 (emphasis in original). The court then accepted the United States's concessions that the defendant had a reasonable expectation of privacy in his pockets and that,

17

as such, the officer's command "effectuated a Fourth Amendment search." *Id.* at 1081–83.

However, *United States v. Cowan*, 674 F.3d 947 (8th Cir. 2012), presents another point of comparison. There, detectives obtained a warrant to search both the premises and the person of a named individual for "indicia of occupancy" including keys during an investigation into suspected drug trafficking. *Id.* at 951. While executing the warrant, police encountered the defendant. *Id.* While frisking the defendant, police felt keys in his front pocket, which they immediately removed. *Id.* The Eighth Circuit determined that seizure of these keys was permitted even though the keys were not inherently contraband because the officer "immediately recognized the object as keys and the warrant specifically authorized seizing keys as indicia of occupancy or ownership of the premises." *Id.* at 953. But the Eighth Circuit's holding was based, in part, on its finding that police had a reasonable belief that the defendant may have been part of a "common enterprise," such that police had probable cause to believe that the keys were evidence of a crime. *See id.* at 953–54.[3]

The facts here do not align with either *Pope* or *Cowan*. Unlike *Pope*, the officers here were armed with a warrant authorizing them to seize Mr. Lombardi's cell phone, and their demand that he hand it over seems a reasonable means of

---

[3] The Eighth Circuit also distinguished the case from *Minnesota v. Dickerson*, 508 U.S. 366 (1993), because, unlike in *Dickerson* where the nature of an object in an individual's pocket was only determined after "squeezing, sliding, and otherwise manipulating the contents of the defendant's pocket," *id.* at 378, in *Cowan* the officer "reasonably could have believed the keys were apartment keys and, therefore, covered by the warrant." 674 F.3d at 953.

effectuating that authority.  Unlike *Cowan*, however, the officers had no reason to believe that Mr. Lombardi was a part of any broader "common enterprise" that would supply them with the probable cause to believe that he was the target of their search. The Court therefore turns to a fundamental, underlying question: did Mr. Lombardi, after noise from his phone alerted officers and after he admitted to having it in his pocket, retain a reasonable expectation of privacy in keeping it in his pocket?

The Court finds that he did not.  "Whether a defendant has a reasonable expectation of privacy in a particular place is a two-pronged inquiry. "[Courts] consider 'first, whether the movant has exhibited an actual, subjective, expectation of privacy; and second, whether such subjective expectation is one that society is prepared to recognize as objectively reasonable.'" *United States v. Werra*, 638 F.3d 326, 331 (1st Cir. 2011) (quoting *United States v. Rheault*, 561 F.3d 55, 59 (1st Cir. 2009)).  Crucially, it is Mr. Lombardi who "bears the burden of proving not only that the search . . . was illegal, but also that he had a legitimate expectation of privacy" in the place being searched.  *Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980).

Here, while Mr. Lombardi does not expressly claim to have had a reasonable expectation of privacy in his cell phone's location in his pocket, he does argue that the cell phone "was concealed on his person."  (ECF No. 47-1 at 34.)  But once the cell phone audibly alerted the officer, and once Mr. Lombardi told the officer that the cell phone was in his pocket, it seems unlikely that he retained a subjective expectation of privacy in the cell phone's location.  And while the fact that he told the officer about the cell phone while he was being detained might arguably weigh against a finding

that he willingly surrendered his subjective expectation of privacy, on the whole it seems questionable that an objectively reasonable person retains an expectation of privacy in the location of a cell phone that audibly alerts officers to its existence while they are in the middle of a protective frisk during the execution of a search warrant.

As a result, the seizure of Mr. Lombardi's cell phone, as effectuated by the officer's demand that he hand it over, was just that: a seizure, rather than a search. Under *Sheehan*, the officer was authorized to seize his phone because it was present within the premises during the execution of the warrant.  70 F.4th at 41.  Ordering Mr. Lombardi to turn over the cell phone was not the "verbal equivalent" of rifling through his pockets, *see Street*, 614 F.3d at 234, but rather the act of the authorized seizure itself.  As such, suppression of evidence subsequently obtained from a search of the cell phone's contents—which, as a cell phone found in the premises, was authorized by the warrant—is not justified.[4]

### 3. Officers Acted in Good Faith in Searching Mr. Lombardi Based on the Court Website Records

Although the Court has found that the officer's demand that Mr. Lombardi hand over his phone did not, under the peculiar circumstances of this case, constitute an unlawful search, given the uncertainty in this area of law the Court addresses the government's strongest alternative argument against suppression: that even if officers exceeded the scope of the warrant by searching Mr. Lombardi, they did so in

---

[4] The Court's finding is limited to the unique circumstances of this case and should not be taken as suggesting that a premises warrant inherently authorizes police to command that persons not obviously connected to the searched premises surrender any personally concealed items that might fall within the warrant's terms.

good faith. (ECF No. 28 at 14–17.) Under the most common application of the "good faith" exception to the exclusionary rule, evidence will not be suppressed "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope." *United States v. Leon*, 468 U.S. 897, 920 (1984); *see also United States v. Gonzalez*, 113 F.4th 140, 148 (1st Cir. 2024) ("Under the exclusionary rule, when a magistrate judge issues a warrant that is not supported by probable cause, the evidence obtained from the search is usually suppressed. That is, unless the *Leon* good-faith exception applies.") (internal citation omitted).

But here, the problem was not that the warrant lacked probable cause or was otherwise inherently deficient, but rather that officers exceeded the scope of the warrant during their initial search of Mr. Lombardi's person. *See Leon*, 468 U.S. at 920 n.19 ("Our discussion of the deterrent effect of excluding evidence obtained in reasonable reliance on a subsequently invalidated warrant assumes, of course, that the officers properly executed the warrant and searched only those places and for those objects that it was reasonable to believe were covered by the warrant."); *United States v. Fuccillo*, 808 F.2d 173, 177–78 (1st Cir. 1987) (finding no good faith where officers exceeded a warrant's scope by seizing the entire contents of a warehouse rather than those targeted by the warrant). As Mr. Lombardi was not named by the warrant, it was not reasonable for officers to believe that the warrant authorized them to search his person, and the exception consequently does not apply to that initial search.

The good-faith exception is not, however, limited only to situations where officers relied on a facially defective warrant. *See Arizona v. Evans*, 514 U.S. 1 (1995). In *Evans*, officers arrested an individual based on an outstanding warrant discovered during a police computer inquiry into that individual's name. *Id.* at 4. Officers later discovered that the outstanding warrant had been quashed before the arrest, and that the mistake was the result of an administrative error by court employees. *Id.* The Supreme Court held that the good-faith exception precluded exclusion of evidence obtained incident to that arrest, finding that the prophylactic purpose of the exclusionary rule was not advanced when the error at issue was not connected to police misconduct. *Id.* at 15; *cf. United States v. Gines-Perez*, 90 Fed. Appx. 3, 4 (1st Cir. 2004) (construing *Evans* as not applicable where the faulty database was the product of *police* error).

Here, the facts bear some distinction from *Evans*: the database relied on by the officers was public facing rather than an internal system for court and police use, the records at issue were probation records rather than an outstanding warrant justifying an immediate arrest, and the officers could conceivably have directly contacted the state probation office to verify Mr. Lombardi's status. Nevertheless, the Court finds that the officers acted in good faith by relying on the court website records. The evidence presented to the Court suggests that, at the time the officers searched the state court website, they had no reason to believe (apart from Mr. Lombardi's own protestations) that its records regarding the duration of his probation might be inaccurate. Thus, while the officers could have directly contacted the state

probation office to verify Mr. Lombardi's probation status, they had no reason to do so, particularly given the evidence presented to the Court that this kind of verification was not common practice by law enforcement.

As such, officers acted in good faith by proceeding based on the court website records that indicated they were permitted to access and search Mr. Lombardi's cell phone. While this only took place *after* they had searched Mr. Lombardi's person to obtain the cell phone and then previewed the contents of that phone, their search of the state court records was independently premised on one officer's recognition of Mr. Lombardi as a prior offender. Under these circumstances, the independent source doctrine resolves any remaining ambiguity as to whether suppression of the evidence from Mr. Lombardi's phone is warranted. *See Nix v. Williams*, 467 U.S. 431, 443 (1984) ("The independent source doctrine allows admission of evidence that has been discovered by means wholly independent of any constitutional violation."); *United States v. Silvestri*, 787 F.2d 736, 739 (1st Cir. 1986) ("In the classic independent source situation, information which is received through an illegal source is considered to be cleanly obtained when it arrives through an independent source."). Had the officers reviewed the court records *before* demanding Mr. Lombardi hand over his cell phone, they would have had a good-faith basis for that demand; the Court sees little reason to penalize the fact that the officers developed this good-faith basis independent of the contents of the phone itself and within minutes of their original demand.

Because the good-faith exception applies to the officers' conduct, even if their demand that Mr. Lombardi hand over his cell phone exceeded the scope of the warrant and was an unauthorized search, the Court finds it proper not to exclude evidence obtained from that phone.

### B.     Mr. Lombardi Knowingly and Voluntarily Waived his *Miranda* Rights

Mr. Lombardi also challenges the voluntariness of his statements made during both his initial interview with the officers and during their later questioning regarding his PIN code. (ECF No. 20-1 at 8–9.) According to Mr. Lombardi, "police showed [him] a *Miranda* waiver form but gave him no meaningful opportunity to read it." *Id.* at 9. Further, Mr. Lombardi alleges "there is no indication that he knowingly waived his rights" and contends that "[h]is signature on the waiver form is non-dispositive because the record clearly indicates that the interrogating officer directed him to sign it." He also argues that the officers coerced him into making statements "during the second, unrecorded, interrogation by threatening to jail him if he didn't answer their questions." *Id.*

Based on the totality of the circumstances, the Court disagrees with Mr. Lombardi's characterization of his *Miranda* waiver. The recorded interview with Mr. Lombardi indicates that officers gave him the *Miranda* waiver form and asked him to review it. Mr. Lombardi responded by asking where he needed to sign to execute the waiver. There is no indication from the record that he was coerced into signing the form. Further, while it would likely have been advisable for the officers to have either verbally read the *Miranda* rights to Mr. Lombardi or asked him to read them

24

himself, their failure to do so does not make his waiver unknowing. *See Van Dusen*, 431 F.2d at 1280. Given Mr. Lombardi's own apparent recognition of the *Miranda* waiver form and his prior involvement with law enforcement, the Court finds his waiver to be knowing.

As such, because Mr. Lombardi's statements during the initial interview were voluntarily made following a knowing and voluntary *Miranda* waiver, suppression of those statements is unwarranted. As the United States has stated its intention not to use as evidence Mr. Lombardi's provision of his passcode during the second, unrecorded questioning by the officers, the Court need not determine whether that questioning violated his right against self-incrimination.

## IV.    CONCLUSION

For the foregoing reasons, Mr. Lombardi's Motion to Suppress Evidence and Statements (ECF No. 20) is DENIED.

IT IS SO ORDERED.

Mary S. McElroy
United States District Judge

January 12, 2026

25